UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:                                                              NO. 09-11300
SARAH REVA KAYE                                                     SECTION A
* * * * * * * * * * * * * * * * *

### ADDITIONAL REASONS AND FINDINGS OF FACT ON REMAND

Sarah Reva Kaye ("Debtor") was married to Malcolm J. Rebennack ("Rebennack") between March 25, 1987 and April 21, 1994. On January 29, 1996 by judgment of divorce, the community between them was terminated effective April 21, 1994. Fifteen (15) years elapsed between termination of the community and Debtor's filing for bankruptcy protection under Chapter 7 of the Bankruptcy Code ("Code") on May 1, 2009. Debtor was granted a discharge on September 24, 2009. She died on October 5, 2009. Her heirs elected to continue with this case in order to claim their inheritance.

I.  **FACTS SURROUNDING THE DIVORCE AND SPOUSAL SUPPORT ACTION**

On January 29, 1996 the state court granted the requested divorce and ordered Rebennack to pay post divorce alimony.[1] Although the community of acquets and gains terminated between Debtor and Rebennack, no partition of community assets was ordered. As a result, Rebennack remained in control of the then existing assets of the community, which consisted principally of rights to songs, recordings and lyrics.

---

[1] The Judgment of Divorce ordered that, by consent of the parties, Rebennack was to pay Debtor $2,7000 per month in alimony *pendente lite* retroactive to April 1, 1984, with credit for payments made by defendant to plaintiff on her behalf. Rebennack also was to pay Debtor $2,200.00 per month in post divorce alimony beginning in February, 1996 and continuing during each month thereafter. Finally, Rebennack also was ordered to pay medical bills and future medical treatments not to exceed $8,500.00 per year. The payments to medical providers were considered alimony. The judgment provided that "either party may file a Rule in these proceedings in this Court after January, 1998 to determine plaintiff's continuing need for post divorce alimony without demonstrating any change in circumstances." Exh. 2 to Notice of Removal of State Court Civil Action (P-5).

1

On August 18, 1998, the state court entered a supplemental judgment of support ("Supplemental Judgement") in favor of Debtor. Under the terms of the Supplemental Judgment, Rebennack was ordered to satisfy outstanding medical charges incurred by Debtor and pay future medical charges incurred after February 1, 1998.

Between 1998 and 2006, Rebennack paid spousal support and Debtor's medical expenses as ordered by the state court. However, on December 1, 2006, Rebennack advised Debtor that beginning on January 1, 2007, he would no longer reimburse Debtor for medical expenses.

On April 6, 2009, Debtor filed a Motion to Enforce Consensual Agreement for Retroactive Reimbursement and for Damages, or Alternatively, Rule to Modify Post-Divorce Alimony, and Incorporated Memorandum ("Support Motion"). Debtor sought: (a) enforcement of the support agreement between Debtor and Rebennack; (b) reimbursement of all unpaid expenses incurred since January 1, 2007; (c) modification of the support agreement to reflect Debtor's current needs; and (d) modification of the state court's decree regarding alimony to reflect the Debtor's current needs. The Support Motion was set for hearing in state court on May 21, 2009.

The hearing did not occur because Debtor filed for bankruptcy on May 1, 2009. Rebennack filed a Notice of Removal of State Court Civil Action on May 19, 2009. The next day, Debtor's counsel filed an Emergency Motion to Remand. In June 2009, this Court remanded all claims asserted by Debtor in her state court action. All the claims were tried in late June 2009.

On August 24, 2009, the state court awarded the Debtor an increase in alimony and reimbursement for the difference between the amount of the new award and that previously paid. The judgment was retroactive to May 7, 2007. The ruling on the alimony dispute was later reversed by the Louisiana Fourth Circuit Court of Appeals ("Appeal Judgment") *(Kaye v. Rebennack*, 60

Case 09-11300 Doc 85 Filed 01/20/12 Entered 01/20/12 15:55:46 Main Document Page 3 of 16

So.3d 1276, 2010-0871 (La. App. 4 Cir. 3/9/11).

## II.  CLAIMS BY AND AGAINST THE BANKRUPTCY ESTATE

Only eight (8) proofs of claim were filed in this case. Rebennack filed Claim 8. His claim for $143,516.23 allegedly constituted one half of the community debts existing as of 1994 and satisfied by Rebennack on behalf of the former community. He also claimed $5,600.00 in payments made to Debtor or on her behalf based on false representations. Claims 2-6 totaled $5,095.51 and were for debts incurred by Debtor long after her divorce from Rebennack. As such they are separate obligations.

Claim 1 was filed by Debtor's prepetition counsel, Lowe, Stein Hoffman, Allweiss & Hauver, L.L.P. ("Lowe Stein") in the amount of $58,066.63. Rebennack acquired Claim 1 during the administration of the case. As of the bankruptcy filing, Lowe Stein had been replaced prepetition by the law firm of Orill, Cordell & Beary, L.L.C. ("OCB") who filed its own proof of claim, Claim 7, for $78,063.08. Both claims were also separate obligations.[2]

## III.  EMPLOYMENT OF OCB AS SPECIAL COUNSEL AND CONTINGENCY FEES DUE AS A RESULT OF THE SETTLEMENT

After the bankruptcy was filed, Trustee filed an Application to Employ Special Counsel ("Employment Application") requesting that OCB continue with its representation of Debtor and

---

[2] An obligation incurred by a spouse before or during the community property regime may be satisfied after termination of the regime from the property of the former community and from the separate property of the spouse who incurred the obligation. The same rule applies to an obligation for attorney's fees and costs in an action for divorce incurred by a spouse between the date the petition for divorce was filed and the date of the judgment of divorce that terminates the community regime. La. C.C. art. 2362.1. If a spouse disposes of property of the former community for a purpose other than the satisfaction of community obligations, he is liable for all obligations incurred by the other spouse up to the value of that community property. La. C.C. art 2369.3 ("Duty to preserve; standard of care – A spouse has a duty to preserve and to manage prudently former community property under his control, including a former community enterprise, in a manner consistent with the mode of use of that property immediately prior to termination of the community regime. He is answerable for any damage caused by his fault, default, or neglect.")

3

the Estate in the partition of the community and ongoing alimony dispute. (P-37). OCB sought in connection with its employment, prepetition legal fees of $78,063.08 plus a 33 1/3% contingency on all amounts garnered for the bankruptcy estate ("Estate").

Rebennack opposed OCB's appointment as special counsel because Debtor owed OCB $78,063.08, based on an hourly fee, for OCB's prior representation. (P-40). OCB argued that its employment was in the best interest of the Estate because OCB represented Debtor prepetition and because it already had invested substantial time and resources into preparing for the state court action against Rebennack. It also argued that other counsel would necessarily have to duplicate OCB's efforts with regard to the alimony dispute.

Ultimately, OCB was employed for a 33 1/3% contingency fee on amounts recovered for the Estate with no specific claim for its hourly fee represented by Claim 7. On September 19, 2010, the Chapter 7 Trustee ("Trustee") filed a Complaint for (A) Turnover of Property and (B) Partition of Community Property against Rebennack. (Adv. 10-1089). Trustee sought turnover of the alimony purportedly owed to Debtor and a division of former community property.

On April 5, 2011, Trustee filed a Motion to Compromise Controversy to Approve Settlement and to Approve Attorney's Contingency Fee Compensation and Reimbursement of Expenses ("Settlement Motion") (P-57). The Settlement Motion resolved all issues between Debtor and Rebennack with regard to the division of former community property. Trustee also agreed to forego seeking writs on the Appeal Judgment.

Under the terms of the settlement, the parties agreed that the gross community as of the date

4

of divorce *and after crediting Rebennack for community debts he satisfied*, was $400,000.00.[3] The settlement provided that Rebennack would pay the Estate its share of the community, Two Hundred Thousand ($200,000.00) Dollars, in two installments. The first installment of One Hundred Thousand ($100,000.00) Dollars was payable fourteen (14) days after an order approving the settlement became non-appealable, and the second One Hundred Thousand ($100,000.00) Dollar installment was due on or before August 29, 2011.[4]

Finally, the agreement provided that Claim 1 was resolved and satisfied in full as part of the settlement, and that Claim 8 was subordinated to the amounts owing on Claims 2 through 6.[5]

When Trustee's Settlement Motion came up for approval, it included a provision calculating OCB's contingency fee "based upon one-third of the gross community of Four-Hundred Thousand Dollars, to wit an attorney's fee of $133,333.33." (Paragraph D of the Settlement Motion) despite

---

[3] Provision A of the Settlement Agreement specifically provides that "the parties agree that the gross community (net of community reimbursements claims of Rebennack), is agreed to be Four Hundred Thousand and 00/100 ($400,000.00) Dollars." Provision B provides that Rebennack will pay to the Estate the Estate's half of the community, to wit, the sum of Two Hundred Thousand ($200,000.00) Dollars (i.e. Estate's interest less the amount due Rebennack), payable as follows..."

[4] The Court has no independent knowledge of whether the payment was made timely. However, the Trustee's Interim Report dated September 4, 2011 indicates that the Trustee holds $119,741.92 in the Trustee's bank account.

[5] Unfortunately the Settlement Agreement contains errors with regard to Claims 1 and 8. First, the recitation says that Claim 1 is "Rebennack's claim in connection with the community property dispute between Kaye and Rebennack." Rebennack's claim actually is Claim 8, according to the Claims Register. Second, the Settlement Agreement says that Claim 8 is based on the judgment of Lowe Stein against the Debtor for $58,066.63, plus attorneys fees, interest, etc. The Claims Register has that claim listed as number 1. As noted above, the Settlement Agreement says that "Claim 1 shall be resolved and recognized as satisfied in full as part of the $400,000.00 settlement" and Claim 8 "shall be subordinate to the full principal plus interest owing on claims numbered 2 through 6, inclusive." Given the definitions set forth in the Settlement Agreement of Claims 1 and 8, this Court will read the Settlement Agreement as the parties obviously intended and will consider Rebennack's reimbursement claim stemming from the community property dispute as satisfied. It also will consider the claim acquired from Lowe Stein as subordinated to the payment of Claims 2-6. See paragraphs 9 and 12 to the Motion and Incorporated Memorandum to Approve Settlement and Approve Attorney's Contingency Fee Compensation and Reimbursement of Expenses and paragraphs 8, 11, 12 and 39 of the Settlement Motion.

5

the fact that the Estate would only receive $200,000.00 from Rebennack or one-half of that sum.

The Settlement Motion was granted in part, and denied in part. Specially, this Court granted all provisions of the Settlement Motion except for those pertaining to the calculation of OCB's fee. OCB was instructed to file a separate fee application and memorandum in support for its position regarding the calculation of its fee.

OCB filed a fee application seeking payment of $133,333.33 in attorneys fees and $13,592.68 in expenses. OCB argued that the contingency fee must be calculated on the gross community of $400,000.00, instead of the $200,000.00 actually received by the Estate.

At the hearing on OCB's Fee Application, it became evident that the amounts payable to the Estate by Rebennack would satisfy Trustee's commission, Claims 2-6 and OCB's alleged contingency fee while denying Debtor's heirs any distribution of the net estate. Specifically, the amounts collected would be distributed:

1. $3,000 in taxes
2. $29,000.00 for fees to Trustee's and Trustee's Attorney, and OCB's expenses of $13,592.68
3. $133,333.00 in fees to OCB
4. $5,095.51 for Claims 2-6
5. $58,066.63 plus $5,970.95 in interest on Claim 1 (claim acquired from Lowe Stein)
(See paragraph 42 of the Fee Application of OCB, LLC, as special counsel to the Trustee)

Ultimately this Court awarded OCB one-third of the net $200,000.00 available for distribution to creditors (a total of $66,666.67 in attorney's fees) plus expenses. OCB appealed the award to the Eastern District.

On appeal OCB argued that this Court erred in calculating its one-third contingency fee based on the $200,000.00 available for distribution to creditors, rather than the gross former community's value of $400,000.00. OCB specifically argued that this Court erred by concluding

6

that the entire community estate was not property of the bankruptcy estate pursuant to 11 U.S.C Sect. 541 of the Bankruptcy Code because Rebennack, as the former spouse, was not going to receive a discharge. OCB also argued that it withdrew its prepetition claim of $78,063.09 because it expected to receive an one-third contingency fee based on the gross community.

OCB avers that it would not have waived its prepetition claim if it had understood that its fee would be limited to only the Debtor's half of the community. The United States District Court remanded the matter to this Court for further articulation of its reasoning.

## IV. ANALYSIS

OCB argues that calculation of its fee should be based on the total amount of the former community because:

1. The Settlement resulted in the turnover to the Estate of $400,000.00, $200,000.00 of which was not paid because it represented repayment of Rebennack's share of his half-interest in net community. Rather than collect the full community and then return half to Rebennack, the Estate only collected its one half interest.
2. Alternatively, if not inconsistently, OCB alleges that the $200,000.00 paid to the Estate represents the gross community net of Rebennack's claims for reimbursement. In fact, Rebennack agreed to resolve and recognize as satisfied in full his claims in connection with the community property dispute.
3. OCB claims that before it waived its prepetition claim and agreed to continue representing Debtor it conferred with Trustee as to how its fee might be calculated. It alleges that both agreed to base the fee on the entire former community rather than the Estate's one-half interest.
4. OCB avers that the Bankruptcy Estate is defined under 11 U.S.C. §541 as the entire community of assets existing between Rebennack and Debtor, therefore OCB recovered the entire community estate.
5. OCB would never have waived its prepetition claim for $78,063.09 if it had realized that its contingency percentage would only be applied to the Estate's portion of the former community. It further alleges that under the Settlement, Trustee and Rebennack agreed to allow it a fee on the entire community share, not only the Estate's interest.

A. Community Assets as Part of the Bankruptcy Estate Under Section 541

The lynchpin of OCB's arguments is whether "property of the bankruptcy estate" includes

7

any and all community property in the possession, custody and control of Rebennack when Debtor filed her bankruptcy petition.

Property of a bankruptcy estate is comprised, with limited exceptions, of "all legal and equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. Sect. 541(a)(1). State law governs what becomes property of the estate at the time of the filing of the petition. *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

When the community property regime is terminated under Louisiana law, "the provisions governing co-ownership apply to former community property, unless otherwise provided by law or by juridical act." La. C.C. art. 2369.1. Article 2369.2 provides that "each spouse owns an undivided one-half interest in former community property and its fruits and products."

As noted above, the former community property had not been partitioned before the bankruptcy was filed. Therefore, Debtor and Rebennack effectively became co-owners of former community property on April 21, 1994.

While the Bankruptcy Code gives a Chapter 7 trustee statutory authority to administer a debtor's interest in co-owned property as well as that of the non-debtor co-owner,[6] assuming co-owned property is utilized for the benefit of the Estate, one-half of the benefits, less costs and expenses associated with the generation of the benefits, not including any compensation to the trustee, is payable to the co-owner.[7]

The co-owner's percentage ownership in the property is not considered "property of the estate" for purposes of 11 U.S.C. Sect. 541. 5 *Collier on Bankruptcy*, 541-22 (Alan N. Resnick &

---

[6] *See, i.e.* 11 U.S.C. Sect. 363.

[7] *See i.e.* 11 U.S.C. Sect. 363(j).

Henry J. Sommer, eds, 16th ed.) (where the debtor holds property as a tenant in common, his or her undivided interest becomes property of the estate under Sect. 541(a)(1)); *In re DeVanzo*, 2010 WL 1780038 (Bankr., E.D. N.Y. May 3, 2010) (the language of the deed allocated 35% interest to the debtor and the remainder to the co-owner; the division of sale proceeds should not be altered and the defendant co-owner should receive 65% of the proceeds.); *In re Summers*, (9TH Cir. 2003) 332 F. 3d 1240 (where deed specified that spouses were taking property as joint tenants, the husband's interest in the real estate was his separate property and could not be included in the debtor-wife's Chapter 7 bankruptcy estate); *See also* Sect. 363(g), (h) and (i), which "permit the trustee to sell a debtor's interest in property which is in the nature of dower or curtesy, or the debtor's interest in property that is held in a tenancy in common, joint tenancy, or tenancy by the entirety and specifies the conditions under which a sale may take place." 5 *Collier on Bankruptcy*, 541-22 (Alan N. Resnick & Henry J. Sommer, eds. 16th ed.).

In the event a community exists at the time of a bankruptcy filing but only one spouse files for relief, community property may be liquidated to satisfy community obligations filed with the Estate. In that instance, the non-filing spouse will receive only the net one half of the community after paying off community obligations. According to *Collier on Bankruptcy*, section 541(a)(2) is designed to pass to the bankruptcy estate the community property that would otherwise be available under applicable state law for the satisfaction of claims against the debtor. *Collier* at 541-11.

In practice the above principles allow community property subject to equal or joint management or control by the spouses to pass to the estate. Typically, the only property of either spouse not included in the estate is the non-debtor's separate property. *Collier* at 541-62. The community property of the spouses is then utilized to satisfy holders of "community claims." The

9

final result is to grant both the filing and nonfiling spouses a "community discharge." This allows the nonfiling spouse to receive a release from unpaid community debts.[8]

Section 101(7) defines a "community claim" as one that "arose before the commencement of the case concerning the debtor for which property of the kind specified in section 541(a)(2)..., whether or not there is any such property at the time of the commencement of the case." Section 101(7) allows state law creditors of the nondebtor spouse or former spouse access to community property for the satisfaction of their community claims and allows them to participate in the distribution of estate assets. *In re Miller*, 167 B.R. 202 (Bankr. C.D. Cal.1994). However, community property is only included to the extent that such property is generally liable for debtor's post-nuptial contractual debts or other allowable claims against the debtor.

This fact pattern is inapplicable to this case for two reasons. First, and most importantly, there were no community assets at the time of Debtor's bankruptcy filing, only co-owned assets. The above principles only apply when a community regime exists at the time the bankruptcy petition is filed, and only one spouse files for relief. In this case, the community terminated fifteen (15) years earlier and the parties were unmarried at the time of filing. Second, the claims filed against the Estate were all separate obligations of Debtor as each was incurred long after the community terminated.

La. C.C. art. 2360 defines a community obligation as "an obligation incurred by a spouse during the existence of a community property regime for the common interest of the spouses or for

---

[8] The community discharge is not the equivalent of a total release from all community debts. To the extent the nonfiling spouse incurred a community obligation and retains separate property post discharge, creditors may seize his separate property to satisfy any remaining community debts. See 11 U.S.C. Sect. 524(a)(3) and La. C.C. art. 2345 (a separate or community obligation may be satisfied during the community property regime from community property and from separate property of the spouse who incurred the obligation.)

the interest of the other spouse." "A judgment of divorce terminates a community property regime retroactively to the date of filing of the petition in the action in which the judgment of divorce is rendered. The retroactive termination of the community shall be without prejudice to rights of third parties validly acquired in the interim between the filing of the petition and recordation of the judgment." La. C.C. art. 159. However, since the community property regime between Debtor and Rebennack terminated on April 21, 1994, almost 15 years before the bankruptcy was filed, none of the claims filed against the Estate constitute community obligations as all were incurred after the judgment of divorce was rendered.

Since all of the claims filed in this case were incurred *after* termination of the community, they are separate obligations of Debtor. Under Louisiana law, none of these creditors have rights in Rebennack's share of the former community assets. Section 541 simply is inapplicable because Rebennack's interest in the undivided community property could not be held liable under Louisiana law for any claims against Debtor.

Because creditors could not look to Rebennack's portion of the community property to pay debts incurred by Debtor after termination of the community, Section 541 does not pull Rebennack's one-half share of the former community, now co-owned, property into his former spouse's bankruptcy proceeding.

A contingency fee agreement is defined as a fee agreement under which the attorney will not be paid unless the client is successful. *In re Coy Farms, Inc*. 417 B.R. 17 (Bankr. N.D. Ohio, 2009). This Court finds that Debtor was ultimately successful in liquidating the undivided co-owned property. Her portion of the co-owned property was agreed to be $200,000.00. As such, this Court finds that the contingency fee can only be calculated based on the Debtor's portion of the co-owned

11

property, or $200,000.00. Put another way, the contingency fee is only calculated on what OCB brought into the estate.[9]

B.         No Community Discharge Necessary

Sect. 524(a)(3) provides a "community discharge" for community claims under certain circumstances:

(a)     A discharge in a case under this title –
        \*\*\*\*
(3)     operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, or recover from, or offset against, property of the debtor of the kind specified in section 541(a)(2) of this title that is acquired after the commencement of the case, on account of any allowable community claim, except a community claim that is excepted from discharge under section 523, 1228(a)(1), or 1328(a)(1) of this title, or that would be so excepted, determined in accordance with the provisions of sections 523(c) and 523(d) of this title, in a case concerning the debtor's spouse commenced on the date of the filing of the petition in the case concerning the debtor, whether or not discharge of the debt based on such community is waived.

Sect. 524(a)(3) effectively enjoins the commencement and continuation of an action to collect on a community claim, that arose before the filing of the petition, against property acquired post-petition that fits the description of Sect. 541(a)(2). *In re Dyson*, 277 B.R. 84 (Bkrtcy, M.D. La. April 29, 2002).

As explained above, community property comprises property acquired during the existence of the community regime through the efforts of either spouse, or that property which is acquired with community property. Thus when a married individual files bankruptcy in Louisiana, all community property of both spouses as of the date of filing becomes property of the debtor's estate, whether or not both spouses file for relief. Upon entry of discharge, the discharge injunction under Sect.

---

[9]The Settlement Agreement clearly acknowledges this fact in Provision B. That provision states that Rebennack " will pay to the Estate the Estate's half of the community, to wit, the sum of" $200,000 "(i.e. <u>Estate's interest less the amount due to Rebennack.</u>)" (Emphasis added)

524(a)(3) insulates the post-petition community, including the interests of the non-filing spouse, from collection activity on the part of a prepetition community claimant.

As noted at the hearing on the fee application and as explained in this Order, the facts of this case did not necessitate a "community discharge." None of the claims filed in this bankruptcy were community debts and would not be satisfied through Rebennack's portion of the former community, now co-owned property.

    C.    OCB did not recover any assets on behalf of Rebennack

As previously provided, at the time of Debtor and Rebennack's divorce, Rebennack remained in possession of all former community assets. Thus, OCB's engagement was to recover the benefits of Debtor's share in the former community from Rebennack himself rather than a third party.

Had OCB been required to recover assets from a third party, and then transfer the recovered amounts back to the non-filing spouse, an argument in *quantum meruit* might exist in its favor. Instead, OCB's actions were of no benefit to Rebennack who under the terms of the Settlement, retained his interest in the former community assets.

Because OCB's efforts failed to benefit Rebennack, his share of the estate can not be charged with their fee. Further, it would be inequitable to charge the creditors and heirs of the Debtor with the "recovery" of Rebennack's community interests as OCB argues.

When OCB requested approval of its employment from this Court it sought a fee structure comprised of a prepetition claim based on hourly rates and a post-petition contingency percentage on all amounts recovered. This was a highly unusual request.

During various hearings, OCB had alleged that the <u>claims against Rebennack</u> were worth in excess of $500,000.00 to the Debtor. Not surprisingly, Rebennack alleged that the former

13

community was barely worth litigating over. Based on the history of litigation between Debtor and Rebennack, it was evident to the Court that the discovery of former community assets would be expensive and perhaps futile. However, OCB remained confident that value existed for the benefit of the Estate.

Given that the Estate was both insolvent and illiquid, the nature of the Debtor's claims was speculative, and the costs to litigate could result in administrative expenses (in the form of legal fees and costs) in excess of the amounts collected, this Court refused to employ OCB on both an hourly and contingency fee basis. Given OCB's argued position regarding the value of the claims it was asking to pursue, this Court believed it sufficient to base OCB's fees entirely on its recovery for the Estate.

In its ruling on the Employment Application, this Court expressed its concerns, and advised OCB that its request was unusual and why it considered OCB's fee structure not in the best interest of the Estate. The hearing was continued without decision to allow OCB an opportunity to contemplate its choices, *i.e.* remain a creditor for its earned prepetition fee but terminate its future representation or waive its prepetition claim in favor of a full contingency award. This Court also warned OCB regarding expenditures of both time and money in the preparation of the case given the Estate's precarious position.

OCB now argues that it reached a "side deal" with Trustee and Rebennack regarding the calculation of its fees. Unfortunately for OCB, neither Trustee nor Rebennack possessed the authority to modify the terms of employment entered with this Court. It also is worth noting that the only party harmed by Trustee and Rebennack's alleged "deal" to pay OCB a contingency fee

14

based on Rebennack's share of the former community are Debtor's heirs who will be denied any distribution from Debtor's Estate.

In a pre-trial conference OCB justified pursuing these claims not only to pay the $5,095.00 in other creditors, but the heirs of the Debtor. During the litigation of this matter, Rebennack argued that his acquisition of the Lowe Stein claim and the waiver of the OCB claim only left roughly $5,095.00 in other claims to pay. Rebennack offered to satisfy those claims if the suit was dismissed. In response, OCB argued that the rights of the Debtor as represented by her heirs should also be protected. This Court agreed. Now OCB argues that distributions to heirs are unimportant by conveniently excluding them from this "arrangement" to calculate the fee. OCB's interpretation amounts to the Estate paying a fee to recover property already in Rebennack's possession for Rebennack.

While the Court regrets that OCB's efforts are not being compensated at its customary rates, the fact remains that contingency fee arrangements are designed for just this type of case. When a cash strapped debtor can not pursue speculative unliquidated claims because she lacks the funding to pay counsel on an hourly basis, contingency fees provide a mechanism for compensation. It is common at the beginning of the representation for counsel in a contingency arrangement to believe that the case is worth pursuing. It is also common for him to expect that when the case is won, his fee will be greater than the compensation he would have earned based on an hourly rate. The reason for the potential windfall is of course the risk and delay in payment he undertakes. In many cases he is rewarded, in others not. But just because the case fails to generate a recovery equal

to the time he has exerted or because counsel had to contend with unforseen obstacles during the case, the awarding a greater fee is not justified.[10]

New Orleans, La., January 20, 2012.

Judge Elizabeth W. Magner

---

[10] OCB argues on page 18 of its Fee Application that "OCB faced and overcame unforseen dilatory tactics employed by Rebennack..." and had to "overcome such unforseen obstacles...."